# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |
|---|---|
| **KHALIL BAAPIR**, | Civil No.: 5:10cv00071 |
| *Plaintiff*, |  |
| v. | **REPORT AND RECOMENDATION** |
| **MICHAEL ASTRUE**, Commissioner of Social Security, |  |
|  | By: Hon. James G. Welsh |
| *Defendant* | U. S. Magistrate Judge |

This is the second civil action instituted in this court by the plaintiff, Khalil Baapir, challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying his claims of entitlement of disability insurance benefits ("DIB") and for Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423, and 42 U.S.C. §§ 1381 *et sec.*, respectively. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

Following adverse agency and administrative laws judge ("ALJ") determinations of his earlier DIB and SSI applications, the plaintiff sought court review of the Commissioner's final determination dated March 9, 2007. This effort was unsuccessful, and summary judgment was ultimately granted in the Commissioner's favor. *Baapir v. Astrue*, 2009 U.S.Dist. LEXIS 55230 (WDVa, June 29, 2009).

In his current applications, the plaintiff again claims to be disabled and this time alleges a March 10, 2007 onset date.[1] These applications were also denied at all levels of the administrative process, including an ALJ denial by written decision dated August 5, 2009 in which it was concluded that the plaintiff retained the functional ability to perform his past relevant work as an airport passenger assistant. (R.11-25,136-138,157-168,171-208.) The Appeals Council denied a subsequent request for review (R.1-7), and the ALJ's decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

The Commissioner has filed a certified copy of the Administrative Record ("R."), which included the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By an order of referral entered on December 10, 2010 this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Both parties have since moved for summary judgment; each has filed a supporting memorandum of points and authorities, and the views of counsel have been heard.

I.      **Summary Recommendation**

Based on a thorough review of the administrative record and for the reasons herein set forth, it is recommended that the plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and an appropriate final judgment be entered affirming the Commissioner's decision denying benefits.

---

[1] This alleged onset date is one day after the date of the adverse ALJ's decision on the plaintiff's initial applications. Thus, the relevant time period in the instant case is from March 10, 2007 until August 5, 2009, the date of the ALJ's adverse decision on the plaintiff's current applications.

## II. Standard of Review

The court's review in this case is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to a period of DIB or to SSI. "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2$^d$ 396, 397 (4th Cir. 1974). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## III. ALJ Findings

After reviewing the plaintiff's medical information in detail, utilizing the agency's standard sequential evaluation process[2] and taking into account the plaintiff's vocational profile,[3] *inter alia* the ALJ made the following findings: (1) the plaintiff did not meet the DIB insured status requirements during decisionally relevant period of time; (2) his "severe" impairments included the residuals of a left upper extremity gunshot injury, a depressive disorder, a somatoform disorder, and a post traumatic stress disorder; (3) his impairments, neither singularly nor in combination met or equaled the severity of a listed impairment;[4] and (4) through the decision date he retained the functional ability to perform the exertional and non-exertional requirements of a range of light exertional work, including his past work as an airport passenger assistant. (R.14-25.)

IV.     **Factual Summary**

---

[2] To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpt. P, Appx. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §.404.1503(a); *Hall v. Harris,* 658 F.2$^d$ 260 (4th Cir. 1981).

[3] At the time of the administrative hearing, the plaintiff was forty-six (46) years of age and classified as a younger worker; he has no functional ability to read or write, and his past relevant work included exertionally heavy skilled work as a butcher, exertionally heavy unskilled work as a laborer, and exertionally light semiskilled work as passenger assistant. (R.79-80.)

[4] The adult impairments listed in 20 C.F.R. Part 404, Subpart P, Appx. 1, are descriptions of approximately 125 physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a [person] to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See* Social Security Ruling (SSR) 83-19." *Sullivan v. Zebley,* 493 U.S. 521, 529-530 (1990).

4

Treatment notes from Harrisonburg-Rockingham Free Clinic and from Rockingham Memorial Hospital show that between December 2006 and September 2008 the plaintiff commonly sought medical care for, what one physician described as, "[a] "litany of [complaints] with unrelated multiple body areas"[5] on a monthly or less frequent basis. (R.324-327,406-417, 423-432,467-508,511-525.)  None of these treatment notes or records demonstrates any decisionally significant change in the plaintiff's physical or mental health status subsequent to the ALJ's denial of the plaintiff's initial applications on March 9, 2007.

Among the myriad of his health-related concerns, the plaintiff complained repeatedly of having chronic headaches; however, a brain-head CT scan on February 27, 2007 (less than one month before his alleged onset date) demonstrated no organic basis for this alleged condition. (R.331.)  On March 21, 2007 (the first date that he sought treatment after his alleged disability onset date), the plaintiff presented with the indefinite complaint that he was "sick." (R.325.)  On that occasion the clinician noted that his physical condition did not appear to be significantly changed, and she described the plaintiff's headache complaint as "vague" due to his inability even to indicate the area of this alleged pain. (*Id*.)  Similarly, when the plaintiff sought treatment for a five-day headache at Rockingham Memorial Hospital on July 27 and again on July 28, 2007, clinical examinations demonstrated no organic basis for this pain complaint, and on both of these occasions the plaintiff chose to leave without waiting either for a CT scan or to see the emergency room physician. (R.424-432.)

---

[5]  *See* R.472.

In addition to reporting chronic continuing headaches, when he was seen at the Free Clinic on May 29, 2007, the plaintiff complained of left chest pain. (R.411-412,481.) An upper gastrointestinal series, however, demonstrated no organic basis for this complaint. (R.414.) Likewise, other than noting the presence of a bullet lodged in the soft tissue of the anterior of the left chest, an X-ray of the chest at the time was similarly negative. (R.335.)

A consultive examination of the plaintiff in July 2007 by Christopher Newell, M.D., also identified no significant physical impairment. (R.340-345.) He noted that the plaintiff gave "poor effort" on strength testing, would not move his left arm, and would not allow Dr. Newell to move it. (R.340-345.) *Inter alia*, Dr. Newell also noted in his report that he found no left arm musculature atrophy, no other muscle atrophy, no joint abnormality, no swelling, no abdominal abnormality, no postural limitations, no limitation in his ability to stand or walk, and no limitation in the use of his right upper extremity. (*Id*.) Additionally, he reported finding no medical basis to attribute the plaintiff's chronic left chest and shoulder pain to the residuals of his old gunshot injury, and Dr. Newell suggested that the plaintiff be seen for a consultive psychological examination due to a probable somatization disorder, possible PTSD and depression. (R.342-343)

Shortly after Dr. Newell's consultive examination, the plaintiff sought treatment through the emergency room at Rockingham Memorial Hospital ("RMH") for a persistent headache that had lasted for two weeks. (R.424) Once again, on examination no physical abnormality could be identified. (*Id*.)

Despite the absence of any identifiable physiologic basis for his persistent health-related complaints, the Free Clinic treatment notes show that throughout the decisionally relevant period the plaintiff continued to make persistent requests for treatment of "terrible" headaches and chest pain and to voice complaints about multiple other medical problems, including anxiety, depression, constant dizziness, heart palpitations, left chest pain, left lower quadrant pain, generalized tenderness, right upper quadrant pain, and feeling as though his whole body was "being shocked." (R.410-413,468-475,477-482.)

Contemporaneous clinical evaluations, however, continued to demonstrate no significant physiological basis for any of these alleged health problems. Blood chemistries and an electrocardiogram were negative. (R.485,488,496-497.) CT scans of the head, abdomen and pelvis were normal; an upper gastrointestinal series demonstrated only a small hiatal hernia suggestive of gastrointestinal reflux disease, and on one occasion it was noted that the plaintiff "appear[ed] stressed." (R.325,411,412,414,417,493-495.) He was also found to be mildly anemic, but he had no iron deficiency; clinically he was found to evidence some cervical tenderness, but no cervical disc disease was demonstrated on a follow-up X-ray, and radiographic studies of his chest and shoulder disclosed no abnormality other than the bullet long-lodged in the soft tissue of his chest wall. (R.338,469,485,504-505.)

Although the Free Clinic records dated during 2007 and 2008 report some clinical evidence that the plaintiff had developed some "mild" degenerative disc disease in the lumbosacral spine, they contain no clinical evidence or suggestionof any significant change in his symptomology. In contrast, however, they continue to document his persistently exaggerated

7

pain complaints, which he continued to relate to multiple disparate body areas. (*E.g.,*R.410-412,414-415,469,472-475,477-478,492,493-495.)

On the basis of this "litany" of unfocused complaints, persistent symptom amplification, the absence of any medically significant physical abnormality and poor cooperation, the plaintiff was diagnosed by the Free Clinic examiner in August 2008 to be suffering from post-traumatic stress disorder ("PTSD") with symptom amplification/hypersomaticism. (R.469, 472.) For all practical purposes, therefore, both before and after his alleged onset date the plaintiff's physical health remained unchanged, and during both periods he continued to complain persistently of varied physical symptoms that had no identifiable physical origin. *See Baapir v. Astrue*, 2009 U.S.Dist. LEXIS 49962, *9-11 (WDVa, June 3, 2009).

The plaintiff's treatment records from Harrisonburg-Rockingham Community Service Board ("CSB") for the period between 2007 and 2009 begin with an entry on April 20, 2007 and a provisional diagnosis of generalized anxiety disorder with future consideration of a possible post traumatic stress disorder ("PTSD") diagnosis. (R.392.) At that time a current GAF assessment of 60 was made, and a maximum GAF of 70 during the preceding year was made.[6] (*Id.*) Two weeks later Kenneth Wildra, M.D., a CSB psychiatrist, noted that the plaintiff was

---

[6] The Global Assessment of Functioning ("GAF") is a numeric scale which ranges from 0 to 100 and is used by mental health clinicians and doctors to represent the judgment of an adult individual's overall level of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), 32 (American Psychiatric Association 1994). A specific GAF score represents a clinician's judgment of an individual's overall level of functioning; for example a GAF of 51-60 indicates "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)," and a GAF of 61-70 indicates "some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social occupational, or school functioning (*e.g.*, occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 32.

neither suicidal nor psychotic and that the plaintiff continued to be focused on his myriad of physical complaints. (R.298, 542-543.)

Over the ensuing three years, Dr. Wildra generally saw the plaintiff on a monthly or bimonthly basis for fifteen-minute medication reviews, and throughout this period he continued to note the plaintiff's persistent Medicaid eligibility concerns, his exaggerated pain-related behaviors and his multiple physical complaints, which could not be related medically to any identifiable physical cause. (R.298,397-401,543,547-548,550,553,564,570-573,578.)

In October 2007 Dr. Wildra offered the plaintiff the opportunity for sheltered workshop employment, but he refused even to attempt this work activity on a part-time basis. (R.397.) An offer of supported employment was again offered in May 2008, and it was again rejected by the plaintiff. (R.552.)

When seen for a consultive psychiatric interview and mental status examination by David Leen, Ph.D., on August 28, 2007, it was once again noted that the plaintiff demonstrated significant physical distress, a preoccupation with his somatic pain, and his need to get "Medicaid." (R.358.) On that occasion Dr. Leen found the plaintiff to be grossly oriented, to be depressed, and to exhibit an affect that was both dysphoric and restricted in range. (R.357-359.) It was Dr. Leen's professional impression that the plaintiff had a depressive disorder, PTSD ("provisional") and a somatoform disorder. (R.360.) He assessed the plaintiff's current level of

9

functioning to be 55 on the GAF scale,[7] and from a mental health standpoint he concluded that the plaintiff retained the functional ability to perform simple repetitive work activities, to maintain regular attendance, to deal appropriately with co-workers and supervisors, and to deal with the usual stressors of competitive work. (R.360-361.)

In September 2007 after reviewing the medical record, a state agency psychologist concluded that the plaintiff's mental health condition neither met nor medically equaled listings 12.04 (affective disorders), 12.06 (anxiety-related disorders) or 12.07 (somatoform disorders), because the medical evidence did not demonstrate the level of impairment-related functional limitations necessary to meet any of these listed mental impairments. (R.362-374.) Based specifically on the consultive examination findings of Dr. Leen, this state agency psychologist also concluded that in most areas of mental functioning the plaintiff was "not significantly limited," but he was "moderately" limited in his ability to maintain attention and concentration for extended periods, in his ability to perform activities within a schedule, and in his ability to make plans independently of others. (R.377-379.)

Four months later, a second state agency psychologist came to the same listing-related and functional capacity conclusions after she separately reviewed the record. (R.442-460.) In addition to giving "great weight" to Dr. Leen's consultive examination assessment, as specific bases in the medical record to support her conclusions, this second state agency reviewer also noted among other things the plaintiff's receipt of CSB outpatient therapy since 2006 on the basis of his treating physician's referral due to PTSB concerns, the plaintiff's improved mood

---

[7] See footnote 5.

and level of distress with the prescription use of Cymbalta, and the "exaggerated nature and presentation" of the plaintiff's somatic behavior when being observed versus his "more restrained' behavior when the doctor was not watching. (R.459-460.)

V. **Analysis**

A.

Conceding during oral argument that the evidence did not support a finding that the plaintiff was physically disabled, his counsel challenges the Commissioner's final decision on the focused ground that the ALJ erred in rejecting the considerable evidence that the plaintiff suffers from a disabling somatoform disorder.[8] Relying on the plaintiff's three-year history of seeking medical treatment through the Free Clinic for a myriad of physical ailments for which there was no demonstrable medical basis, on this three-year longitudinal record of mental health care through the CSB and on Dr. Wildra's opinion that he suffers from a somatoform and anxiety disorder with attendant mental and aptitude limitations that prevent his participation in any meaningful work on a sustained basis (R.555-561), the plaintiff presents three interrelated challenges to the decision of the Commissioner. Specifically, he argues that the ALJ erred (1) in failing to find that his condition met or equaled a listed impairment, (2) in failing to give controlling weight to his treating psychiatrist, and (3) in failing to award benefits on the basis of the plaintiff's proof of disability.

---

[8] A somatoform disorder is defined as one which manifests physical symptoms for which there are no demonstrable organic findings and for which there is a strong presumption that the symptoms are linked to psychological factors. *See* Stedman's Medical Dictionary, p. 510 (26th ed. 1995).

In reply the Commissioner argues that the plaintiff's evidence fails to meet the Act's stringent standard requiring proof not only of a mental impairment but also severity sufficient render him incapable of performing all work. *See* 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(A), and 1382c(a)(3)(B). In his brief the Commissioner argues that the plaintiff's reliance on Dr. Wildra's opinion and functional assessment is misplaced, not only because Dr. Wildra's own medication notes are "replete with examples" that undermine the plaintiff's claim for benefits but because they call into question any conclusion that the plaintiff's feigned symptoms are unintentional.

In addition, the record shows that the plaintiff's somatization disorder was never deemed to be of sufficient severity to require psychosocial intervention or treatment. There has been no pharmacologic treatment of this disorder. There has been no testing or clinical examination upon which to base an assessment of the severity any associated mental or physical impairment. In contrast, however, the record contains significant evidence that the plaintiff does not have any severe work-related limitations due to the disorder. (*E.g.,*R.397,398,527,531,542-543,547,550, 553,564,570.)

For example, in October 2007 Dr. Wildra reported the plaintiff's pain behaviors to be "exaggerated in nature" but "more restrained" when he thought he was not being watched. (R.397.) Similarly, in February 2009 Dr. Wildra reported that the plaintiff had "dropped his somatic behavior, walk[ed] normally, and [did] not grimace or shift excessively." (R.570.) And by April 2009 the plaintiff told Dr. Wildra that he was experiencing less anger and improved impulse control. (R.564.)

12

Despite these and multiple other similar clinical observations, Dr. Wildra opined in September 2008 (and reiterated in May 2009) that the plaintiff suffered from a functionally disabling somatization disorder. (R.555-561,563.) Dr. Wildra, however, qualified his diagnosis by stating that the condition was "on the somatoform/factitious boundary." (R.527.) He also expressly acknowledged that his diagnosis was based on "family reports" of the plaintiff's excessive and extremely melodramatic pain behaviors, that his medication management had been for anxiety and depression, and that the plaintiff was "not likely to participate" in any meaningful assessment of his functional abilities. (R.556,557,561.).

In his written decision the ALJ listed in detail the somatoform-related impairments reported by Dr. Wildra; he then took note of their significant inconsistencies with Dr. Wildra own office records, and he noted the fact that the plaintiff had not been either entirely compliant with the medication regime or fully cooperative with the consultive examiners. (R.21-23.) He next considered and adopted the functionally less-limiting opinions of the consultive examiners and the state agency reviewers. (*Id.*) And he took note of the fact that any analysis of the plaintiff's current claim must begin with recognition of the fact that the Commissioner's prior adverse final determination was dated July 28, 2006. (R.23.) *See Albright v. Commissioner*, 174 F.3rd 473, 477 (4th Cir. 1999) (a prior decision is "highly probative" of a plaintiff's continuing residual functional capacity to perform his past relevant work one date after the prior decision); *see also* Acquiescence Ruling ("AR") 00-1(4).

Additionally, the ALJ took note of the plaintiff's statements and those of his wife to the effect that he was only mildly restricted due to pain in his daily activities and had only mild

13

difficulties with social functioning. (R.16.)  He noted that the record contained no evidence of the plaintiff having experienced any episodes of decompensation. (*Id*.)  And after rating the severity of the plaintiff's somatization-related functional limitations, the ALJ concluded that they were neither of listing-level severity[9] nor were they incompatible with the ability to do any gainful activity. (R.16-17.)

Contrary to the plaintiff's argument that the ALJ erred by discounting Dr. Wildra's treating source opinion, the ALJ in fact gave "good reasons . . . in [his] decision for the weight" he gave to this treating source opinion." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  He fairly scrutinized the evidence in its totality, and he adequately explained the grounds for his findings at each level of the agency's sequential decision-making process. Substantial evidence, therefore, clearly supports a finding that the plaintiff had less than disabling limitations, and the ALJ's decision not to afford controlling weight to the opinion the plaintiff's treating psychiatrist was adequately explained and is supported by substantial evidence.

**B.**

The plaintiff's general argument that the record contains substantial evidence that he has been totally disabled from employment on a regular and sustained basis must, likewise, fail.  In the absence of some error by the ALJ in applying the law, the question for the court is not

---

[9] The paragraph B criteria for the plaintiff's somatoform disorder is met when the his disorder results in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt.P, App. 1, §§ 12.04(B), 12.06(B) and 12.07(B). Marked is defined as "more than moderate but less than extreme;" it "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the plaintiff's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id*. § 12.00(C).  The term repeated episodes of decompensation, each of extended duration generally "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* § 12.00(C)(4).

14

whether there is substantial evidence of disability, but whether there is substantial evidence to support the ALJ's contrary conclusion. Based on a thorough review of the record, one is compelled to conclude that there is substantial evidence to support the ALJ's decision. In addition to the previously discussed evidentiary bases upon which the ALJ discounted Dr. Wildra's opinion, the ALJ was entitled to rely upon the consultive examination findings and conclusions of Dr. Newell and Dr. Leen and on the less than disabling determinations of the state agency psychologists. *See Johnson v. Barnhart,* 434 F. 3$^d$ 650,655 (WDVa, 2005); *Smith v. Schweiker*, 795 F.2$^d$343, 346 (4$^{th}$Csir. 1986).

## VI. Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. All facets of the Commissioner's final decision are supported by substantial evidence;

2. The plaintiff has not met his burden of proving his entitlement either to a period of DIB or to SSI;

3. The ALJ's decision gave the requisite consideration and weight to the treating source opinions of Dr. Wildra;

4. Substantial evidence supports the finding that the plaintiff's mental health condition neither met nor equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1;

5. Substantial evidence in the record supports the finding that through the decision date the plaintiff retained the functional ability to perform his past relevant work as an airline passenger assistant;

6. The ALJ gave proper consideration of the objective and subjective evidence in making his adjudication of the plaintiff's claims; and

7. All material findings and conclusions of the ALJ are supported by substantial evidence, and the Commissioner's decision should be affirmed.

**VII. Recommended Disposition**

For the foregoing reasons, it is RECOMMENDED that an order be entered AFFIRMING the final decision of the Commissioner, GRANTING SUMMARY JUDGMENT to the defendant, DENYING plaintiff's claim, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

**VIII. Notice to the Parties**

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: this 15th day of July 2011.

/s/ *James G. Welsh*
United States Magistrate Judge